IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 6, 2009 Session

**STATE OF TENNESSEE  v. DANA WEBB**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-00785      Carolyn Wade Blackett, Judge**

**No. W2008-02815-CCA-R3-CD  - Filed February 5, 2010**

The defendant, Dana Webb, appeals the denial of her request for judicial diversion, arguing that the  trial court abused its discretion by focusing on the need for deterrence while not considering factors in favor of diversion.  Following our review, we reverse the judgment of the trial court and grant judicial diversion.  The matter is remanded to the trial court for the imposition of conditions of the probationary term.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Larry D. Sims, II (on appeal) and Ross Sampson (at trial), Memphis, Tennessee, for the appellant, Dana Webb.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Scot A. Bearup, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On February 7, 2008, the defendant was indicted for one count of felony child abuse and one count of misdemeanor child abuse based on her treatment of her four-year-old son

and her eleven-year-old daughter[1] "between July 1, 2007, and July 31, 2007." The record reveals that the indictment was based on an incident in which the defendant poured mineral spirits into the children's bath water in an effort to remove paint from their bodies, which caused each child to develop a serious skin rash. On September 22, 2008, the defendant pled guilty to the charges, leaving sentencing for the trial court's determination but requesting that she be considered for judicial diversion.

At the November 6, 2008, sentencing hearing, the forty-four-year-old defendant testified that she pled guilty because she was wrong, wished to accept responsibility for her actions, and did not want her children to have to go through more than they already had. She agreed that the photographs admitted as exhibits to the hearing accurately depicted her home at the time of her arrest on the charges. She said that because she had been ill, she had let things get out of control, which resulted in the "deplorable" conditions evident in the photographs. During her later cross-examination, she explained that her health problems consisted of Addison's Disease, diagnosed in 1999, and prolific endometrium, diagnosed in May of 2007, which caused her to experience excessive bleeding.

The defendant testified that the children's injuries occurred after she and the children had gotten paint on themselves while painting a room in their house. She first placed the children in a bathtub to scrub themselves with soap and water while she attempted to clean the paint off herself at the sink in the same bathroom. After noticing that the paint was not coming off easily with soap, she plugged the sink, poured mineral spirits in, and used it to remove the paint from herself. The defendant said that when her daughter saw how well the mineral spirits worked and wanted to use mineral spirits too, she "stupidly added some" to the children's bath water.

The defendant testified that the bathtub was filled with water and that she "just added a little bit" of the mineral spirits to the tub. Both children, however, developed a rash from their exposure to the substance. The defendant testified that she responded by draining and cleaning out the tub, refilling it with water, washing the children with soap and water, draining and cleaning the tub again, and then having the children use an "Ave[e]no oatmeal soak." When her daughter's rash persisted, she took her to a dermatologist, who told her that she had taken the appropriate steps to counteract the effect of the mineral spirits, advised her to continue with the Aveeno oatmeal soaks, and informed her that he could give her daughter

---

[1]The children's dates of birth are not included in the record. The defendant, however, reported their respective ages as six and twelve in the presentence report, which was prepared in October 2008. Her ex-husband also testified at the November 2008 sentencing hearing that the defendant's daughter was currently twelve years old and would be thirteen in either January or February 2009, and the prosecutor referred to the defendant's four-year-old son during questioning. We presume, therefore, that in July 2007 the defendant's daughter was eleven years old and her son was four years old.

a steroid shot if the oatmeal soaks did not clear the rash. The defendant testified that she asked the doctor to go ahead and give her daughter the steroid shot at that time.

The defendant testified that the children currently live with her ex-husband, Darren Webb, who had been awarded custody through juvenile court as a result of the conditions in her home and the injuries the children had sustained. She said that Mr. Webb was her son's biological father and had known her daughter, the product of a previous relationship, since the child was a baby. She stated that although she and Mr. Webb had personal problems, he was a good man and a wonderful father to the children. She said that she had every other weekend visitation with the children and was current on child support payments. She also agreed that the children's custody should remain with Mr. Webb, who, according to her testimony, had been "a godsend for them."

The defendant testified that the conditions at her home were now fine except that she currently lacked electric power because she was trying to adjust to paying child support. However, she was in the process of attempting to secure a second job to alleviate her financial difficulties. She stated that she was working hard to improve her life, was not sure if her present employer was aware of the charges against her, and believed that a felony conviction could negatively affect her employment in the future. Finally, she said that she was willing to abide by any conditions the court should attach to an award of judicial diversion.

On cross-examination, the defendant testified that she was taking Cortisol, Florinef, Synthroid, and Megace in April, May, June, and July of 2007. She acknowledged that her physician had prescribed the antidepressant, Wellbutrin, in April 2007 but said that she never took it because she feared it would negatively affect her ability to care for her children. She stated that she asked for Xanax instead and that her physician prescribed that drug in August 2007. She said that she thought her physician had diagnosed her with "a lot of anxiety and stress," but not depression.

When questioned about the various photographs of her home, the defendant testified that the two garbage bags of beer cans, which were in a "throw out room" along with an assortment of other items that she had been sorting and cleaning out, represented beers that she had drunk over a period of time. She stated that the chicken in the refrigerator with a "sell by" date of November 4, 2006, was meat that she had taken out of the freezer to thaw. She testified that she had placed her dog, which she regularly brought inside the house, inside his crate because the neighbors had complained about his barking. She said that the dog had not been in the crate for long at the time the photograph was taken and explained that the piles of dog hair, which had been on the floor "probably for a few days," resulted from the fact that he was shedding his winter coat and her vacuum was broken. She stated that the stairs in her home were covered with "[a] lot of spilled items, books, comforter, pillow,

boxes" and had been in that condition "[p]robably for a while." She testified that she had pulled up the carpeting in one of the rooms, in which she kept the children's kittens, because she had spilled paint on it. The defendant estimated that it was the middle of May when she had last washed dishes and indicated that conditions at the house got out of control at the beginning of May. She testified, however, that the crayon drawings on the walls "occurred at different times" and that a hole in the stairway wall happened in 2003 when her ex-father-in-law fell off the stairs and "put his foot through the wall."

The defendant testified that she had attended Southwest Tennessee Community College, where she took nursing prerequisites; the University of Memphis, where she studied psychology, math, English, and human development; and Concorde Career College, where she took courses to be a surgical technician. She said she was currently employed in the billing department of Baptist Hospital. She acknowledged that she lost a previous job with the sheriff's department, where she had worked as a dispatcher from May 16, 1996 to January 10, 2004, due to her violation of the attendance policy, which she said was due to her health problems.

The defendant testified that she did not read the warning label on the mineral spirits bottle, used the mineral spirits to clean the paint off her face, arms, and hair without incident, and "wasn't thinking" when she poured the mineral spirits in the children's bath water. She said that she noticed within a few minutes that it was hurting the children, so she immediately took steps to counteract it. She stated that the incident occurred on a Saturday and she took her daughter to see the dermatologist on Tuesday. She admitted that she did not call Mr. Webb, a paramedic, to tell him what had happened or to seek his assistance or advice.

The prosecutor read aloud a portion of the statement[2] of the defendant's daughter:

Saturday, we got put in the tub by my mom and told us to sit in odorless mineral spirits for an hour. And, then she left us in there by ourselves. She got up and went upstairs because she didn't want to hear us screaming. And, once we got out she put Vaseline and camphor on us but that didn't help. So, she left us there by ourselves and went to Kroger and got some more.

The prosecutor read other portions of the statement in which the defendant's daughter said that the defendant drank five or more beers each day, that the daughter was the one who had cleaned up the beer cans, that the defendant spent her money on beer instead of food, and that her brother had fallen and hurt his head on the dog's crate several weeks earlier, but the

---

[2]The statement itself is not included in the record.

defendant had been drunk and "didn't care." In response, the defendant denied that she had been drunk or that her son had fallen and hit his head on the dog crate, that she drank five beers a day, or that she spent her money on beer instead of food. She also denied that she left the children to soak in mineral spirits for an hour, that they screamed, or that she put camphor on their injuries. She testified that the children eventually began crying because their injuries hurt and that she put Aqua Four on them. She said that after she used all the Aqua Four she had, she left the children alone in the house while she went to the Kroger up the street to purchase more Aqua Four and a box of popsicles.

The prosecutor also confronted the defendant with statements that were apparently made to the police during the course of the investigation by two additional individuals: the woman who babysat the defendant's son, and a neighbor whose children played with the defendant's daughter. According to the prosecutor, the babysitter reported that she had become increasingly concerned for the son's well-being over the past several months, as the child slept more than the typical four-year-old and frequently showed up at her house with only a single hot dog and no juice for lunch. The neighbor apparently told police that the defendant's daughter, who would tell her that her mother was not at home, often played with her children at her house "well after dark," and that she had seen the defendant's son riding his tricycle in his front yard unattended. In response, the defendant testified that the babysitter had informed her that she provided juice for the children she babysat. She also said that she was at home, and aware of her daughter's whereabouts, during the times that her daughter played at the neighbor's home.

On redirect examination, the defendant agreed that she and the children were living in "extremely nasty" conditions, which were solely her responsibility, during the time when the charges arose. She said that she felt she was stressed, and not depressed, during that time. She indicated, however, that her refusal to take the antidepressant had stemmed from her fear of the medication rather than a disagreement with her physician's diagnosis. She said she was currently on her medication and that the condition of her home was "[t]en times better" than it had been.

Darren Webb, the defendant's ex-husband and the father of her son, testified that he was an EMS coordinator with the City of Bartlett Fire Department. He said that he did not learn of the children's injuries until the first week of August when one of the children told him of the defendant's having put them in a bathtub full of mineral spirits. He said that the defendant failed to mention the children's injuries or to say anything about their need for Aveeno oatmeal baths when he picked them up for their weekend visitation. Webb testified that he contacted the police department to ask for a child abuse investigation, accompanied the detective who was immediately sent to the residence, and was awarded emergency custody of the children at that time. Approximately eight months later, he was awarded permanent custody following a hearing in juvenile court.

Webb testified that the children's pediatrician was concerned about the possible long term effects of the children's "acute exposure to the mineral spirits" and had sent the children for further testing to see if their bone marrow had been affected. The results of those tests were negative, but the children needed to be monitored on a yearly basis "for a significant period of time then every five years or so after that." Webb described the long term effects of acute mineral spirits exposure as follows: "it soaks into the body, soaks into the bone marrow, destroys the bone marrow and can cause cancer, long term."

Webb further testified that the defendant had been ordered by the juvenile court to participate in family counseling sessions, but to date she had not complied. Finally, he expressed his strong opposition to the defendant's receiving judicial diversion:

> I'm completely against the granting of the diversion, primarily because my main concern is the safety and well-being of those children. And, knowing the lengthy history of the irresponsible decisions that [the defendant] has made, the failure to comply with the Juvenile Court orders to participate in their counseling and the potential for her to request custody again for these children, I think that all would be compromised if she got the diversion.

On cross-examination, Webb conceded that the bathtub in which the children had been sitting was not filled with mineral spirits. He repeated that his primary concern was for the safety and well-being of the children and said that he thought "the potential for [the defendant] to petition the Court for custody in the future would be compromised if she got the diversion."

The defendant's daughter testified as follows. The defendant poured half a can of mineral spirits in the children's bath water when the paint they had gotten on themselves would not come off with soap and water. The mineral spirits began burning after about ten minutes, and she and her brother started screaming and both got out of the tub. The defendant told them to get back in the tub and then left the room. She climbed back out of the tub again after about five minutes, but her brother remained a little longer. The defendant put Vaseline on her brother and then left for the store, dead-bolting the door and taking the house phone with her. The defendant returned with popsicles and Aveeno, which she poured into fresh bath water after draining but not cleaning the tub. Her brother remained in the Aveeno bath longer than she did, which was why it had worked for him but not for her.

At the conclusion of the hearing, the trial court concluded that the defendant was not "the type of individual that deserves to be placed on judicial diversion." The trial court noted the defendant's lack of a criminal history as well as her health problems. The court found, however, that none of the defendant's various health problems excused her actions in putting mineral spirits in the children's bath water. The court found disturbing the poor conditions

in which the defendant kept her home, as well as the fact that she was "self-medicating" on beer, but placed the greatest emphasis on the circumstances of the offense and the need to deter both the defendant and the general public from similar acts of child abuse in the future. The trial court's ruling states in pertinent part:

> And, just by virtue of the Exhibits that this Court has seen in terms of the way you kept your house, the way you kept your refrigerator, the way you kept food, the way you let crayon writings be all over the wall, is evidence that there was something clearly wrong in your household in terms of what was going on. And, while that's not why we're here today, in terms of the conditions of your house, all of those things go to this Court's decision as to whether or not a young parent who had the responsibility of taking care of two children, one under the age of six, was concerned enough about their welfare not to place them in harm[']s way. There is no mistake about putting mineral spirits in a bath water. It is adequately labeled. You know yourself just by virtue of you[r] putting it on your own skin, that is not something that somebody takes a bath in. And, as you stated on the record, it's a horrible mistake. But, then, that gets to the point of what is a mistake? Because I can understand a three year old, a six year old pouring mineral spirits in water because they can't read. But, you can read. Common sense tells any parent what things are more than likely to be harmful to a child versus more than likely not to be harmful. Even though you may have a bottle of baby aspirin you know not to give that child a hundred baby aspirins, even though they say baby aspirin. Okay. And, even though the stove may not be on high but you have enough sense not to put the child's hand on the stove if it's on low because they're still going to get burned. That's just common sense.

The court concluded its ruling as follows:

> And, I look at all that [defendant's alcohol consumption] when I look at the social history. Because that is extremely important when it comes to making a judgment on behalf of you and what's in the best interest of your children and what's in the best interest of you in the future. Even though you don't have a criminal history, it doesn't necessarily mean that you don't deserve some type of punishment. Because it sounds like, if I take it literally in terms of what the statute says, that you get two more chances to go out there and do something just as crazy, just as dangerous, just as harmful because this is the first time I've ever done this so I should be able to just walk away. . . . Based upon the fact that there needs to be [a] very strong deterrent for all these young children who are being abused by parents, yes, you didn't shake a baby to death. No, you didn't take a gun and shoot your child in the head but this

abuse is not very far. I can't imagine being placed in a tub and somebody putting mineral spirits and being burned and then having to wait until mommy goes to Kroger with the door locked and the phone and come [sic] back. . . . . The Court needs to send a strong message to the community that this type of behavior is just not going to be tolerated. . . . Because of the seriousness of the case, because of the social history, because of everything that I've heard today. I don't think that you are the type of individual that deserves to be placed on judicial diversion.

The trial court, therefore, sentenced the defendant to three years of split confinement, with the defendant required to serve eight weekends in jail and the remainder of the time on supervised probation. The trial court additionally ordered that the defendant perform 100 hours of community service, submit to frequent and random drug screens, undergo drug counseling, and take parenting classes.

## ANALYSIS

The defendant contends that the trial court erred in its denial of judicial diversion by focusing on the need for deterrence while giving insufficient weight to factors in favor of diversion, including her lack of a criminal record, genuine remorse, willingness to accept responsibility for her actions, history of gainful employment, mental and physical health issues, and amenability to correction. As we will explain, we agree with the defendant.

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A) (Supp. 2008). A qualified defendant is one who is found guilty or pleads guilty or nolo contendere to a misdemeanor or Class C, D, or E felony; has not been previously convicted of a felony or a Class A misdemeanor; and who is not seeking deferral for a sexual offense, a violation of Tennessee Code Annotated sections 71-6-117 or 71-6-119, or a Class A or B felony. Id. § 40-35-313(a)(1)(B)(i). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b).

The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). As such, it will not be disturbed on appeal absent an abuse of discretion. Electroplating, 990 S.W.2d at 229; Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168. To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw,

967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant diversion, the trial court must consider all of the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. Id.

In this matter, the trial court's ruling demonstrates that it focused almost exclusively on the circumstances of the offense and the need for deterrence in its denial of judicial diversion. Tennessee courts, recognizing the similarities between judicial and pretrial diversion, "have drawn heavily from the case law governing pretrial diversion to analyze cases involving judicial diversion." Cutshaw, 967 S.W.2d at 343. From those cases, we have learned that "while the circumstances of the case and the need for deterrence may be considered as two of many factors, they cannot be given *controlling* weight unless they are 'of such overwhelming significance that they [necessarily] outweigh all other factors.'" State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993) (quoting State v. Markham, 755 S.W.2d 850, 853 (Tenn. Crim. App. 1988)).

We note that the defendant's crime was limited to a brief period of time and, in fact, resulted from her attempting to remove paint from her children, after she found that soap, alone, was not effective doing so either from them or from her. Finding that the children were developing a rash from exposure to the mineral spirits in the bath water, she left and purchased a container of Aveeno, which she poured into new bath water for the children. Her son stayed in the tub longer than her daughter and did not develop as serious a rash as did she. Seeing that her daughter's rash was continuing, the defendant took her to a dermatologist, who gave the daughter a steroid shot. We note that the record does not make it appear that the victims sustained serious bodily injury, and the trial court did not describe their injuries as being burns. Additionally, the defendant testified that she was attempting to obtain a second job to alleviate her financial problems.

The trial court did not fully address several sectors in favor of diversion or explain how the circumstances of the offense and the need for deterrence outweighed those factors. The trial court did not give consideration to the post-offense actions of the defendant but, instead, focused upon the facts of the offense and the condition of her home. In our view, the facts of the offense, the employment history of the defendant, her remorse, and acceptance of responsibility demonstrate that the defendant's acts, resulting in her

-9-

convictions, occurred under unusual circumstances making it unlikely that a sustained intent to violate the law motivated her. Thus, we conclude that, under the totality of the circumstances, substantial evidence does not exist to support the trial court's denial of judicial diversion. Accordingly, we remand the matter to the trial court for entry of an order placing the defendant on judicial diversion, upon "reasonable conditions," and not to exceed the maximum sentence length for the offenses to which she pled guilty. Tenn. Code Ann. § 40-35-313(a)(1)(A).

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we reverse the order of the trial court and grant judicial diversion. The matter is remanded for the imposition of conditions of the probationary term.

_____
ALAN E. GLENN, JUDGE